JoNES, Ohief Judge,
dissenting in part:
Defendant furnished the commodity. It was a comparatively new substance.
According to finding 9, the defendant knew that the mercury sludge contained quantities of arsenic trioxide and plaintiff did not know it, and he was not given the information which defendant had in its possession. The failure to do so was due to negligence or complete disregard for the rights of plaintiff. Ordinarily in dealing with the Government, one would not be expected to suspect that an officer of the Government would either knowingly or negligently furnish him an inherently dangerous article without any warning. Generally speaking, it is reasonable to operate in an atmosphere of trust, rather than suspicion.
I would allow plaintiff to recover the damages that occurred up to the time plaintiff became aware of the dangers which he faced. After he became fully aware of the dangers he probably assumed the risk on any damages or aggravations thereafter.
In the light of the record as a whole I am inclined to believe that plaintiff’s maladies, or the aggravation thereof, flowed directly from working with these poisonous articles. I do not know how such matters can be proved except from circumstances. They certainly were the natural and probable result, and that is the usual test.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Carl J. Warneke, of Chicago, Illinois, is the person described as claimant in an Act of Congress entitled “An Act for the Belief of Carl J. Warneke,” Private Law 85-501, 85th Congress (72 Stat. A-70), approved by the President of the United States on July 25, 1958, conferring jurisdiction upon this court to hear, determine and render judgment upon the claim set forth in the petition filed herein.
2. Plaintiff, who was born in 1903, took courses in the 1920’s at the Milwaukee School of Engineering, Milwaukee Chemi *689 cal Institute, and California Institute of Technology. In the 1930’s he took courses at the University of Notre Dame. He holds no college degrees in chemistry, physics or otherwise.
3. In 1933 or 1934 the plaintiff, with one Oscar Floyd, organized a business partnership known as the American Scientific Specialties Company, which was later incorporated under the laws of the State of Illinois as American Scientific Company. In 1937 Mr. Floyd sold his entire interest in American Scientific Company to the plaintiff. The plaintiff was a principal in and also participated in the operations of another company called American Scientific Manufacturing Company, which was closely related to the American Scientific Company by exchange of officers.
4. By purchase order dated September 22, 1944, the War Department, through the Chicago Signal Depot, contracted with the American Scientific Company for the latter to furnish services and materials for the reduction of approximately 82,500 pounds of “mercury sulphate sludge” to approximately 50,000 pounds of chemically pure mercury, including redistillation of the mercury and packing it in shipping containers.
5. Between September 14,1944, and January 9,1945,56,353 pounds of a substance identified on three shipping documents as “mercuric chloride sludge,” and on the fourth and final shipping document as “mercury sludge recovered,” were shipped to the American Scientific Company to be distilled and processed for the recovery of the pure mercury content. These shipments were made from the defendant’s Chemical Warfare Service Arsenals at Denver, Colorado; Huntsville, Alabama; Pine Bluff, Arkansas; and Edgewood, Maryland.
6. The defendant knew, but did not advise the plaintiff, that the sludge it shipped to the plaintiff for reduction to mercury was a waste product resulting from the manufacture of Lewisite by the United States Army Chemical Corps in 1943 and early 1944. During World War II the United States Army Chemical Corps manufactured 20,000 tons of Lewisite, a chlorovinyl arsenic compound which is a vesicant or blistering agent and also an irritant to the lungs, nose, throat and eyes. Lewisite is a highly toxic compound in *690 either a vapor or liquid form and, when absorbed through the skin or respiratory system, causes systemic poisoning. However, field tests established that Lewisite, when exposed to moisture and hydrolizing conditions, loses much of its toxicity and becomes less effective than mustard gas as a chemical warfare agent. Therefore, the production of Lewisite was discontinued in late 1943 or early 1944.
7. Practically all of the Lewisite manufactured by the United States Army Chemical Corps during World War II was produced by a process involving the condensation of acetylene with arsenic trichloride in the presence of mercuric chloride in aqueous hydrochloric acid. A byproduct of the manufacture of Lewisite was a liquid mercuric sludge.
8. After the production of Lewisite had been discontinued by the Army Chemical Corps in late 1943 or early 1944, the Chemical Warfare Service Arsenals were directed to decontaminate the liquid mercuric sludge by removing the Lewisite, and then to process it for shipment to the Army Signal Corps for further processing.
9. Although the defendant knew that the mercuric sludge in question was a byproduct of Lewisite manufacture and contained quantities of poisonous elements such as arsenic trioxide, the plaintiff did not know this and was not informed. From the documents accompanying the shipments and the markings on the barrels and drums in which the sludge was shipped, the plaintiff was justified in thinking that the material was either mercury sulphate sludge or mercury chloride sludge, which combinations would differ only slightly from each other.
10. From a chemical standpoint, the term “sludge” means a combination of substances usually in a liquid or semi-solid state which is the residue or waste product of various manufacturing processes. The term “mercury sulphate sludge” connotes a mixture of materials usually in semi-solid form containing mercuric sulphate and other components which are unknown unless described. Chemical analysis of the material shipped by the defendant to the plaintiff revealed that it consisted of 23 to 29 percent arsenic trioxide, 10 to 12 percent mercuric chloride, almost 3 percent organic arsenic (calculated as Lewisite, presumably that which remained *691 after the defendant’s decontamination process), and proportions of hydrochloric acid, sulphur and chlorine. This analysis was furnished to the plaintiff by the defendant on July 27,1945, and was the first time that plaintiff knew the material contained Lewisite, although he knew much earlier that it contained some form of arsenic. It contained no mercuric sulphate, contrary to the indications of the contract. Generally, sludge of the type shipped to plaintiff is described for its most valuable component, which in this case was mercury. In common chemical parlance it is not incorrect to refer to such sludge as a mercuric chloride sludge, even though it contains such a large element of arsenic trioxide. The plaintiff knew or should have known that the sludge which was to be shipped for processing was not a chemically pure substance, and apparently did not perform a chemical analysis to determine the elements present in the sludge prior to processing it to extract the mercury contents, but relied upon the description of the material as provided in the contract, shipping documents and on the containers. Graduate chemists were on the plaintiff’s payroll to assist plaintiff in performance of the contract.
11. Mercuric sulphate itself (as opposed to a mercuric sulphate sludge containing other unknown chemical elements) is practically insoluble in water, contains no volatile materials, and metallic mercury can be extracted from it by simple processes requiring the use of no protective clothing other than gloves. On the other hand, mercuric chloride sludge containing arsenic trioxide and Lewisite in the proportions present in the material shipped by the defendant to the plaintiff under the contract involved in this suit, is an inherently poisonous substance which would require special handling and protective clothing to extract and refine the metallic mercury content.
12. The plaintiff conducted its initial operations under the contract indoors at its place of business at 1850 Elston Avenue, Chicago, Illinois. During the early stages of contract performance the plaintiff and his employees used no protective clothing, other than gloves, in the extraction processes. The chemical process employed by plaintiff involved the addition of grain iron to the sludge in order to *692 reduce the acid content and cause an exchange reaction, thus liberating the metallic mercury. This operation was performed by warming the mixture in an open, cast-iron and steel furnace, then draining off the mercury into vacuum stills for distillation. During the distillation process acrid fumes were given off and the distillation columns were stopped up at times by a substance which the plaintiff identified as arsenic. Neither before nor since the contract in suit has the plaintiff had any experience in working with arsenic compounds.
13. Upon the discovery of arsenic in the sludge, soon after the work had begmi, plaintiff requested the Signal Corps to conduct a chemical analysis of the material and to furnish the plaintiff and his employees protective clothing. Such clothing, including gas masks, was furnished to the plaintiff in late October or early November 1944, and was thereafter continuously used in the performance of the contract.
14. Because of the fumes given off during the reduction process, the plaintiff moved his reduction equipment, consisting principally of a cast-iron and steel furnace, to another location at 1963B North Hamlin Avenue, Chicago, where the process was carried on in the open air.
15. The plaintiff personally participated with his employees in the operations involved under the contract. Several months after commencement of operations, in the late fall of 1944, the plaintiff became ill for a month or two, exhibiting such symptoms as nausea and vomiting, swollen and bleeding gums, blistered skin on his face, hands, forearms, and ankles, and swollen wrists. Several of his employees also developed some of these symptoms.'
16. In the spring of 1945 the cast-iron and steel furnace in which the crude product was being warmed exploded, exposing the plaintiff and his employees to concentrated chemical fumes which were sufficiently toxic to destroy vegetation then growing across the street from the plaintiff’s plant on Hamlin Avenue. The cause of the explosion is not adequately established by the record, although as to it there is some scientific conjecture not material to the issues.
17. Shortly following the explosion of the furnace as described in the preceding finding, the plaintiff suffered *693 another episode of nausea and vomiting, swollen gums, blistering of the face, hands and feet, swollen joints, muscular pain and fatigue, and loss of energy and appetite, despite the fact that plaintiff and his employees wore heavyweight plastic coated gloves, rubber boots and gas masks. From 1944 to 1947 the plaintiff’s weight fell from 155 pounds down to 118 pounds. At time of trial he weighed 145 pounds. Although there is expert evidence provided by the defendant tending to establish that the hydrolization of Lewisite and arsenic trichloride in the reduction process employed by the plaintiff would render the vapors therefrom innocuous, it is reasonable to conclude that most of the ailments of the plaintiff during and immediately following contract performance were the proximate result of his exposure to the vapors thrown off by the mercuric sludge in the course of its processing. However, it is not established that physical disability resulting from such chemical poisoning would have a permanent effect. Recovery from chemical poisoning of this type is usually complete.
18. While the contract was being performed the plaintiff’s related company, American Scientific Manufacturing Company, manufactured at the same premises high intensity lamps, which involved extensive work by the plaintiff with mercury. It is not established that plaintiff’s work in connection with lamp production had any causative connection with the ailments of which he complains in this suit.
19. Following the explosion at plaintiff’s plant in 1945, as described in finding 16, supra, the plaintiff was directed by the local health authorities to discontinue such work in Chicago, and the plant was then moved to Murfreesboro, Arkansas. On August 14, 1945, a notice of termination of the contract was issued by defendant, and on March 27,1946, the termination agreement was executed. Upon the termination of the contract approximately 28,000 pounds of the original 56,000 pounds of mercury sludge had been processed and approximately 28,000 pounds remained to be disposed of. The plaintiff endeavored to sell the termination inventory of sludge by writing letters to prospective purchasers, in which letters the plaintiff described the sludge as Lewisite Arsenic Mercurial Sludge.
*694 20. Starting in about the year 1946 the plaintiff developed deformities in his hands and feet. They became progressively worse during 1947 and 1948, and by 1949 the physical deformities in his hands, elbows, knees, ankles and feet attained their present state. There is agreement that the plaintiff is a victim of rheumatoid arthritis. He had no such condition prior to 1944.
21. It is not established by the evidence that there was any causal relationship between the plaintiff’s condition of rheumatoid arthritis and his exposure to fumes and vapors in the course of his performance of the contract in suit as related in previous findings. While the causes and cure of rheumatoid arthritis are medically obscure, in the judgment of qualified medical witnesses who testified for the parties there is no known causal connection between rheumatoid arthritis and heavy metal poisoning. It is known that heavy metal poisoning will produce some forms of neuritis affecting temporary loss in power and functions of the muscles, and it is suspected that a relationship exists between arthritis and prolonged stresses and strains, but there is not sufficient evidence to warrant the conclusion that the rheumatoid arthritis from which the plaintiff suffers is the consequence of the chemical poisoning to which he was subjected during the period of contract performance.
22. Since 1948 the plaintiff has been disabled from earning a living by reason of rheumatoid arthritis. His companies were dissolved in 1948 or 1949 due to the failure of his health and inability to carry on the business.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, his petition is dismissed.